UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| WYMAN KASSA, BRIAN WAYLUND, and JAMIE WAYLUND, | Case No. 06-CV-0904 (PJS/JJG) |
| Plaintiffs, | |
| v. | MEMORANDUM OPINION AND ORDER |
| KERRY, INC., d/b/a Kerry Specialty Ingredients, | |
| Defendant. | |

---

    Patricia A. Bloodgood and Susan E. Ellingstad, LOCKRIDGE GRINDAL NAUEN PLLP; Clayton D. Halunen, HALUNEN & ASSOCIATES; and Michael L. Puklich, NEATON & PUKLICH, PLLP, for plaintiffs.

    Robert H. Brown, LANER, MUCHIN, DOMBROW, BECKER, LEVIN & TOMINBERG, LTD.; and Bradley J. Lindeman and John J. McDonald, Jr., MEAGHER & GEER, PLLP, for defendant.

    This matter is before the Court on defendant Kerry, Inc.'s objection [Docket No. 38] to Magistrate Judge Jeanne J. Graham's October 10, 2006 Report and Recommendation ("R&R") [Docket No. 36]. In her R&R, Judge Graham recommends that Kerry's motion for summary judgment [Docket No. 12] be denied and plaintiffs' motions to amend [Docket Nos. 7 & 24] be granted. The Court agrees with Judge Graham's recommended dispositions and therefore adopts in part her R&R and overrules Kerry's objection. But because the Court does not entirely agree with the reasoning of the R&R as it relates to Kerry's summary-judgment motion, the Court writes separately to explain its reasons for denying summary judgment.

I.  BACKGROUND

Kerry is a corporation that makes and markets various food products.  Kerry has operated a plant in Albert Lea since 2000, when Kerry purchased the plant from Armour, Inc.  When it took over the plant, Kerry hired Armour employees, and those employees continued to be represented by Local 160 of the International Brotherhood of Teamsters — the same union that represented the employees when they worked for Armour.

Plaintiffs Wyman Kassa, Brian Waylund, and Jamie Waylund work for Kerry at its Albert Lea plant.  Plaintiffs have sued Kerry for its failure to pay them for the daily donning and doffing of what they call "sanitary and protective safety gear."  Pl. Mem. Opp. Def. Mot. S.J. at 1 [Docket No. 23].  According to plaintiffs, Kerry's failure to pay for donning and doffing violates § 7(a)(1) of the federal Fair Labor Standards Act (FLSA), 29 U.S.C. § 207(a)(1), and the Minnesota Fair Labor Standards Act's provisions relating to overtime pay, Minn. Stat. § 177.25 subd.1.  Plaintiffs have also asserted various common-law claims against Kerry.

Discovery has not yet begun (although Kerry has filed an appendix [Docket No. 16] that includes excerpts from depositions taken in a different case against it, *Matter v. Kerry, Inc.*, No. 05-CV-0643 (RHK/JJG) (D. Minn.)).  Nonetheless, Kerry moves for summary judgment on plaintiffs' FLSA claims.  Kerry argues that under 29 U.S.C. § 203(o) — § 3(o) of the FLSA — Kerry is not required to pay plaintiffs for their donning and doffing time because, based on the undisputed facts, there is a "custom or practice" under the governing collective-bargaining agreement ("CBA") that such time is not compensable.

## II.  DISCUSSION

### *A.  Standard of Review and Governing Law*

A party is entitled to prevail on a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, a court must assume that the nonmoving party's evidence is true and draw all justifiable inferences arising from the evidence in that party's favor.  *Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003).

> The FLSA exempts employers such as Kerry from paying a unionized employee for
>
> > any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time during the week involved . . . by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee.

29 U.S.C. § 203(o).  Whether § 203(o) applies in this case depends on the answers to two questions:  First, are the items at issue in this case "clothes" under the statute?  And second, under the governing CBA, is there a "custom or practice" of nonpayment for the donning and doffing of these "clothes"?  Kerry is entitled to summary judgment only if, on this record, both questions must be answered "yes."

### *B.  What Are "Clothes"?*

Plaintiffs ask the Court to deny Kerry's summary-judgment motion because the items at issue in this case — variously called by plaintiffs "sanitary and protective safety gear," Pl. Mem. Opp. Def. Mot. S.J. at 1, "sanitary and safety gear," *id.* at 2, and "personal protective

equipment," *id.* at 8 — are not "clothes" under § 203(o). Plaintiffs assert that the Ninth Circuit decided this very question in *Alvarez v. IBP, Inc.*, 339 F.3d 894 (9th Cir. 2003), *aff'd,* 546 U.S. 21 (2005), and they ask this Court to deny Kerry's motion based on *Alvarez*. Pl. Mem. Opp. Def. Mot. S.J. at 6-8.

Plaintiffs read too much into *Alvarez*. *Alvarez* involved the donning and doffing of a wide variety of items — from hardhats, hair nets, ear plugs, and cotton gloves, to metal-mesh aprons, leggings, and gloves, to plexiglass arm guards and Kevlar gloves. 339 F.3d at 898 n.2. *Alvarez* divided these various items into two broad categories: "non-unique protective gear such as hardhats and safety goggles," *id.* at 903, on the one hand, and "specialized protective gear," on the other, *id.* at 905. *Alvarez* did not address whether items of non-unique protective gear were "clothes" under § 203(o); instead, *Alvarez* held that time spent donning and doffing such gear was noncompensable because it was *de minimis*. 399 F.3d at 904. (After all, it takes mere seconds to put on a hardhat and a pair of safety goggles.) As to specialized protective gear, *Alvarez* held that, because FLSA exceptions such as § 203(o) must be narrowly construed, items of such gear were *not* "clothes" within the meaning of § 203(o). 399 F.3d at 905.

Plaintiffs argue that this case involves the kind of specialized protective gear that *Alvarez* held not to be "clothes" under § 203(o). But *Alvarez* does not give plaintiffs as much help as they claim, for at least a couple of reasons.

First, *Alvarez* did not fully describe what gear it considered "non-unique protective gear" as opposed to "specialized protective gear." It is not clear on which side of the *Alvarez* line some items may fall. Further, *Alvarez* used the term "personal protective equipment" interchangeably with the term "specialized protective gear," *id.*, despite the fact that the former

term seems broader than the latter.  After all, an item of "protective gear" could be "personal" even if it is not "specialized."

Second, according to Kerry, plaintiffs are in fact required to wear only hair nets, beard nets, safety glasses, and uniforms consisting of a shirt, pants, and a smock.  Def. Mem. Supp. Mot. S.J. at 3; Bailey Decl. ¶¶ 4-5 [Docket No. 14].  Plaintiffs do not dispute this (though they do point out that the CBA requires employees to wear "safety shoes").  Pl. Mem. Opp. Def. Mot. S.J. at 8.  Instead, plaintiffs emphasize that both the CBA and Kerry's plant manager describe the items worn by employees as "personal protective equipment," *id.,* a term also used in *Alvarez*, 399 F.3d at 905.

Plaintiffs attach too much significance to labels.  Regardless of whether it is labeled "personal protective equipment" or something else, a hair net is still a hair net, pants are still pants, and a smock is still a smock.  Whether the items that plaintiffs don and doff are "clothes" under § 203(o) depends on what those items *are*, not on what they are called by the CBA, by Kerry's plant manager, or by anyone else.

The Court also rejects plaintiffs' assertion that other district courts have already determined that the type of hair and beard nets, safety glasses, and uniforms that they must wear qualify as "specialized protective gear" for *Alvarez* purposes.  Pl. Mem. Opp. Def. Mot. S.J. at 7. In *Gonzalez v. Farmington Foods, Inc.*, the court held that § 203(o) did not apply where the employees donned and doffed a wide range of items, among which specialized gear — including various guards, a hook, a knife holder, and a piece of steel for straightening a knife edge — predominated over clothing.  296 F. Supp. 2d 912, 927, 930-31 (N.D. Ill. 2003).  Similarly, *Fox v. Tyson Foods, Inc.*, involved not only items like those involved in this case, but also, among

other things, "protective mesh gloves . . . dust masks, plastic sleeve covers, and hard plastic arm guards." No. CV-99-BE-1612-M, 2002 WL 32987224, at *3, 2001 U.S. Dist. LEXIS 26050 (N.D. Ala. Feb. 4, 2002). *Fox* held, without differentiating among these various items, that § 203(o) did not exempt the employer from paying for donning and doffing time because these items were not "clothes." 2002 WL 32987224 at *5-7.

Unlike *Gonzalez* and *Fox*, this case does not involve a mixture of what *Alvarez* labeled "non-unique protective gear" and what *Alvarez* labeled "specialized protective gear." To the contrary, this case involves *only* items that *Alvarez* labeled "non-unique safety gear." As noted, *Alvarez* was silent on the question of whether such items should be considered "clothes" under § 203(o), and neither *Gonzalez* nor *Fox* establishes that such items are *not* "clothes."

The Court agrees with Judge Graham that, based on the undisputed evidence adduced so far, the items at issue in this case — except perhaps the hair nets and the beard nets[1] — are "clothes" under § 203(o). Specifically, based on the word's ordinary meaning, "clothes" includes pants, shirts, smocks, and boots. And, for people who wear them, glasses are essentially part of their clothing, so standard safety glasses also qualify as "clothes." (Even if standard safety glasses are not "clothes," the time that it takes to put on a pair of glasses is *de minimis*.)

---

[1]Hair nets and beard nets are perhaps different, as they are purely functional and are not generally considered "clothes" as that term is ordinarily used. But the precise classification of hair nets and beard nets is not important, for two reasons: First, donning and doffing those items alone is surely a *de minimis* activity. (On this point, the Court agrees with *Alvarez*. 339 F.3d at 903.) Second, the Court is denying Kerry's motion for summary judgment for reasons unrelated to the classification of hair nets and beard nets.

That said, the Court cannot go as far as Judge Graham and suggest that *all* protective gear is necessarily "clothes" under § 203(o). *See* R&R at 5-6. To take an example from *Alvarez* (339 F.3d at 905), this Court would not likely find that an "environmental spacesuit" (or an actual spacesuit, for that matter) is "clothes" for purposes of § 203(o). The Court does not believe that *Steiner v. Mitchell*, 350 U.S. 247 (1956), is to the contrary. In *Steiner*, the Supreme Court applied § 203(o) to clothes-changing by employees who worked in a chemical plant. To the contemporary mind, a chemical plant conjures up images of "spacesuits" or other specialized protective outerwear. But in *Steiner* the Court mentioned that the employer provided its employees with work clothes because "the acid causes such rapid deterioration that the clothes sometimes last only a few days." *Id.* at 251. This suggests that the clothes at issue in *Steiner* — clothes that the Court did not describe in any detail — were not, in fact, particularly specialized, and could have been shirts, pants, and other items that would be "clothes" under anyone's definition of the term. In any case, *Steiner* did not address the meaning of "clothes" under § 203(o).

The Court believes that whether a particular item of protective gear should be considered "clothes" under § 203(o) depends on the exact nature of the item and the exact circumstances under which it is used. A cloth jumpsuit, for instance, is probably clothing even if worn by a car mechanic as protection from oil and grease; a space suit is probably not clothing, even though it is a kind of protective outfit; and other types of garments and safety equipment will present closer questions. None of the items at issue in this case, however, presents a close question. All of those items are "clothes" for purposes of § 203(c) — or, in the case of hair nets and beard nets, the time devoted to donning the items is *de minimis*.

*C. What Is a "Custom or Practice" Under a CBA?*

To prevail on its § 203(o) defense, Kerry must establish not only that the items at issue in this case are "clothes" — which it has done — but also that there is a "custom or practice" under the relevant CBA of not paying for donning and doffing those clothes.

Plaintiffs argue that such a "custom or practice" does not exist in this case because the issue of paying for changing clothes has never been raised and abandoned by the union in the course of negotiations with Kerry.  Pl. Mem. Resp. Def. Obj. R&R at 2-5 [Docket No. 44].  Judge Graham agreed with plaintiffs.  R&R a 6-8.  The Court recognizes that, as Judge Graham explained, federal cases could be read to interpret § 203(o) to require that the issue of payment for clothes-changing time have been expressly raised and abandoned in union-management negotiations before a "custom or practice" of nonpayment for such time can be found to exist.[2]  The Court does not believe, however, that the case law requires "custom or practice" under § 203(o) to be defined so narrowly.

To be sure, if the issue of paying for changing clothes is raised and abandoned in the course of union-management negotiations, this will generally be *sufficient* to establish a "custom or practice" of not paying for such time under a CBA.  But it does not follow that the issue must *necessarily* have been raised and abandoned during CBA negotiations.  Rather, the term "custom or practice" is broad enough to capture a long-standing practice by an employer of nonpayment

---

[2]The R&R can also be read to imply that a "custom or practice" under § 203(o) might be established by evidence that the union brought a grievance about nonpayment for clothes-changing time.  R&R at 7-8.  The Court does not address this question, which is not raised by plaintiffs and is raised only indirectly by Kerry (through its citation of *Philadelphia Coca-Cola Bottling Co.*, 340 N.L.R.B. 349 (2003), and Kerry's discussion of the union's failure to bring any grievances over the issue, Def. Mem. Supp. Mot. S.J. at 3).

for clothes-changing time — even if the issue of payment for such time has not been raised in union-management negotiations — provided that the employer can demonstrate that the practice of nonpayment was sufficiently long in duration and that its employees knew of and acquiesced in the practice.

This interpretation is consistent with most federal case law on § 203(o). Admittedly, one district court, in an unreported opinion, observed that "[m]ere silence alone cannot confer on a particular practice the status of a 'custom [or] practice'" under § 203(o). *Fox,* 2002 WL 32987224, at *8. But *Fox* cited no authority for this proposition, and the Court does not find *Fox* persuasive.

The Eighth Circuit has yet to address the meaning of "custom or practice" under § 203(o). Cases from other circuit courts of appeal, however, are not contrary to this Court's position. In one interesting decision — *Arcadi v. Nestle Food Corp.*, 38 F.3d 672 (2d Cir. 1994) — the Second Circuit distinguished between "custom" and "practice" under § 203(o). The statute uses the disjunctive — "custom or practice." Thus, to establish a defense, an employer in Kerry's position must show *either* a "custom" *or* a "practice" of not paying its employees for donning and doffing. According to the Second Circuit, "custom" relates to the past; to determine whether a "custom" exists, a court looks backward for evidence of "an ongoing understanding with some continuity." *Id.* at 675. "Practice," by contrast, can be forward-looking. No matter what has happened in the past, a "practice" can exist if the parties to a CBA "negotiate over an issue and have an understanding that resolves it," even if the issue is not expressly addressed in the CBA. *Id.*

Applying this rule, *Arcadi* held that, under § 203(o), an employer did not have to pay its employees for donning and doffing newly required uniforms where the union had asked, during CBA negotiations, to be paid for that time and then had dropped the demand. *Id.* Thus under *Arcadi*, raising and later dropping the issue of payment for clothes-changing time is *sufficient* to create a "practice" under § 203(o). But *Arcadi* does not say that this is the *only* way that such a "practice" can be established. Moreover, *Arcadi* says nothing specific about what is needed to establish a "custom." Indeed, because raising and dropping an issue in CBA negotiations creates a "practice" under *Arcadi*, and because *Arcadi* distinguishes a "custom" from a "practice," *Arcadi* at least implies that a "custom" can be created differently than a "practice." If so, raising and dropping the issue of payment for clothes-changing time in CBA negotiations is not necessary to establish a "custom" of nonpayment for such time under § 203(o).

Other appellate cases have, like *Arcadi*, involved situations in which the issue of nonpayment for clothes-changing time was raised in union-management negotiations. These cases therefore did not address whether a "custom or practice" might have existed if the issue had *not* been raised. For example, in *Hoover v. Wyandotte Chemicals Corp.* (the earliest appellate case on the meaning of "custom or practice" under § 203(o)), the Fifth Circuit was asked to decide whether a "custom or practice" of nonpayment that both sides agreed existed in light of previous CBA negotiations had been terminated when, during later CBA negotiations, the union protested the nonpayment policy. 455 F.2d 387, 388-89 (5th Cir. 1972). *Hoover* held that the history of nonpayment for clothes-changing time, together with the fact that the issue of nonpayment was raised regularly in CBA negotiations, established a "custom or practice" of nonpayment under § 203(o). *Id.*

More recently, the Fifth Circuit followed both *Arcadi* and *Hoover* in *Bejil v. Ethicon, Inc.,* another case in which compensation for clothes-changing time had been raised in CBA negotiations.  269 F.3d 477, 480 (5th Cir. 2001).  *Bejil* observed that "where the union and employer discuss an issue, the result may be custom or practice, even if the collective bargaining agreement is silent on the issue."  *Id.*  Because the employer and the union had negotiated over clothes-changing time but did not require that time to be paid under the CBA, *Bejil* held that a "custom or practice" existed under § 203(o).  *Id.*  But again, *Bejil* said nothing about whether a "custom or practice" could exist under § 203(o) if payment for clothes-changing time had *not* been discussed during CBA negotiations.

The Third Circuit, however, has expressly rejected the notion that a "custom or practice" under § 203(o) can arise only if the issue of payment for clothes changing has been raised in formal union-management negotiations.  In *Turner v. City of Philadelphia*, 262 F.3d 222, 226 (3d Cir. 2001), the Third Circuit instead endorsed a broader rule, under which a "custom or practice" under § 203(o) can be created "through a prolonged period of acquiescence."  *Id.*

The precise breadth of *Turner*'s rule is difficult to gauge because of the case's facts. *Turner* involved a dispute between Philadelphia and its police officers over clothes-changing time.  The Third Circuit's decision to uphold a summary judgment that a "custom or practice" of nonpayment existed under § 203(o) was based on four key facts:  (1) for 30 years, Philadelphia had not paid for clothes-changing time; (2) every CBA was silent on the issue; (3) the union president raised the issue during labor-management meetings, though not during formal CBA negotiations; and (4) the union never filed a grievance over the issue.  *Id.* at 225.  On its facts, then, *Turner* is not *inconsistent* with the rule that a "custom or practice" under § 203(o) exists

only if the issue is raised at least informally in union-management negotiations. But *Turner* did not speak in such narrow terms. Instead, *Turner* described § 203(o) as "simply restating the well-established principle of labor law that a particular custom or practice can become an implied term of a labor agreement through a prolonged period of acquiescence." *Id.* at 226.

The Court believes that *Turner*'s broad language about the meaning of "custom or practice" under § 203(o) is consistent with the statutory language, Supreme Court case law, and relevant Eighth Circuit law. The Court therefore does not read *Turner* as requiring that, before a "custom or practice" can be established under § 203(o), nonpayment for clothes-changing time must have been raised in union negotiations (whether formal or informal).

The Supreme Court's decision in *Detroit & Toledo Shore Line R.R. Co. v. United Transportation Union* (a case *Turner* relied on, 262 F.3d at 226) supports a broad reading of "custom or practice" under § 203(o). 396 U.S. 142 (1969). *Detroit & Toledo* involved the scope of § 6 of the Railway Labor Act (RLA), 45 U.S.C. § 156, which forbids employers from unilaterally changing "rates of pay, rules, or working conditions" while certain union-management disputes are pending before the National Mediation Board. 396 U.S. at 146-47. The employer argued that § 6 applied only to "rates of pay, rules, or working conditions" that were expressly contained in a CBA. *Id.* at 147-48. The Supreme Court disagreed, and held that § 6 applies to "those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." *Id.* at 153. To determine whether § 6 covered the particular practice challenged in *Detroit & Toledo*, the Court looked to whether the practice "had occurred for a

*sufficient period of time* with the *knowledge and acquiescence* of the employees to become in reality a part of the actual working conditions." *Id.* at 154 (emphasis added).

The Eighth Circuit has followed *Detroit & Toledo*'s approach. In *Brotherhood of Maintenance of Way Employees v. Burlington Northern Railroad Co.*, the court observed that "[w]hen long-standing practice ripens into an established and recognized custom between the parties," that practice becomes part of the working conditions that § 6 of the RLA protects from unilateral change. 802 F.2d 1016, 1022 (8th Cir. 1986). *See also Bhd. of Maint. of Way Employees v. Chicago & Nw. Transp. Co.*, 827 F.2d 330, 334 (8th Cir. 1987) (finding no error in district court's finding under § 6 that a particular rule that was not part of the CBA became, "by virtue of the parties' longstanding and recognized custom and practice," an implied term of the CBA). Nothing in Eighth Circuit case law suggests that the "knowledge and acquiescence" required under *Detroit & Toledo* can be demonstrated only through evidence that a particular issue — such as compensation for clothes-changing time — was raised in union-management negotiations.

This Court believes that the three elements identified in *Detroit & Toledo* — time, knowledge, and acquiescence — are essential not only to determining "objective working conditions and practices, broadly conceived" for purposes of § 6 of the RLA, but also to determining the existence of a "custom or practice" for purposes § 203(o) of the FLSA. Accordingly, Kerry bears the burden of establishing that its policy of noncompensation for clothes-changing time lasted for a sufficiently long time, with sufficient knowledge and acquiescence by Kerry's employees, that the policy became an implicit term — a "custom or practice" — under the CBA. Evidence that an issue was raised in union-management

negotiations is *one* way, but not the *only* way, to prove knowledge and acquiescence by union employees.

Whether a CBA implicitly contains certain terms is normally a question of fact for the jury. *Alton & S. Lodge No. 306 v. Alton & S. Ry. Co.*, 849 F.2d 1111, 1114 (8th Cir. 1988). At this point, the evidence is simply too thin for the Court to find, on motion for summary judgment, that there was a "custom or practice" of nonpayment for clothes-changing time under the CBA. In particular, Kerry has not provided sufficient evidence of its employees' knowledge of or acquiescence in Kerry's policy of noncompensation. Kerry notes that Teamsters Local 160 represented plant employees "for many years" before 2000, when Kerry took over the Albert Lea plant. Bailey Decl. ¶ 3. But Kerry has not explained the relevance (if any) under § 203(o) of the history of relations between Local 160 and the *former* owner of the Albert Lea plant. On the issue of whether a "custom or practice" exists between *Kerry* and its employees, it would seem that events since 2000 are centrally important. But even if past relations between Armour and Local 160 are relevant, Kerry has not provided sufficient information about those past relations to warrant summary judgment.

Furthermore, although (as noted above) evidence that the issue of payment for clothes-changing time was raised in union negotiations may demonstrate the knowledge and acquiescence necessary to establish a "custom or practice" of nonpayment under § 203(o), Kerry has provided no such evidence. Instead, Kerry has provided a declaration stating that there is a "long-standing practice" between Kerry and the union of nonpayment for clothes-changing time and that there is "no evidence" that the union ever raised the issue in CBA negotiations. Holt Decl. ¶ 4 [Docket No. 15]. Kerry has also submitted deposition testimony given in a different

case by the president of Local 160, Wayne Perleberg. Perleberg said that union members never raised the issue of payment for clothes-changing time among themselves or with the company, and that the union never filed a grievance over this issue. Dep. Appx. Tab C – Perleberg Dep. at 13-23 [Docket No. 16].

The Court is unprepared to find that Kerry's six-year history of nonpayment for clothes-changing time, together with evidence that the union never complained about such nonpayment, is sufficient to establish, as a matter of law, a "custom or practice" of nonpayment under § 203(o). Indeed, to the extent that the union members never raised the issue even among themselves, this may suggest that they did *not* knowingly acquiesce in Kerry's policy of nonpayment for clothes-changing time. If an employer's history of nonpayment for clothes-changing time were sufficient, by itself, to establish a "custom or practice" under § 203(o), then § 203(o) would essentially be an unlimited FLSA exemption applicable to every unionized employer that did not pay for clothes-changing time. The Court does not believe that § 203(o) is so sweeping.

The Court expresses no opinion as to whether Kerry will be able to establish its § 203(o) defense at trial (or, conceivably, on a later motion for summary judgment). The Court merely holds that a reasonable jury could conclude that Kerry's failure to pay plaintiffs for donning and doffing did not reflect a "custom or practice under a bona fide collective-bargaining agreement." For that reason, Kerry's motion for summary judgment is denied.

ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, the Court OVERRULES Kerry's objection [Docket No. 38] and ADOPTS IN PART Judge Graham's Report and Recommendation [Docket No.36] to the extent that it is consistent with this Memorandum Opinion and Order.  Accordingly, IT IS HEREBY ORDERED THAT:

1. Defendant's Motion for Summary Judgment [Docket No. 12] is DENIED.

2. Plaintiffs' motions to amend [Docket Nos. 7 and 24] are GRANTED.

Dated: May 8, 2007

s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge